Filed 12/16/14  P. v. Sandoval CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038925 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. WF01021) |
| v. | |
| JOSE AVELINO SANDOVAL, JR., | |
| Defendant and Appellant. | |

## I.    INTRODUCTION

A jury convicted defendant Jose Avelino Sandoval, Jr. of second degree murder (Pen. Code, § 187, subd. (a)[1]), and he pleaded guilty to three counts of attempted murder (§§ 664, 187, subd. (a)).  He was sentenced to an aggregate prison term of 26 years 8 months to life.

Defendant was not the actual shooter, but the jury was instructed defendant could be convicted of the murder and attempted murders if he was an aider and abettor or an uncharged coconspirator.  On appeal, defendant contends there is insufficient evidence to support his murder conviction, claiming he was merely present at the scene.  We will affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## II.      BACKGROUND

### A.      *The Shooting*

On March 21, 2009, Angel Escobedo was home from college, visiting his family, who lived in the Apple Hill condominium complex in Watsonville.  Angel had spent the previous night playing video games with his younger brother, Sonny Escobedo, and three of Sonny's friends:  Jesus "Jesse" Nieto, Rene Lara, and Marshall Hernandez.[2]  None of the five young men were involved with any gangs at the time, although Marshall was "kind of" gravitating towards gang activity.

At about 2:00 p.m., Angel, Sonny, Jesus, Rene, and Marshall were playing basketball on a court in the condominium complex while listening to music that was playing on Angel's iPod.  Julian Escobar and defendant approached.  Julian and defendant looked angry, "like they wanted problems."  They came straight towards the group, walking in an aggressive manner.

Julian was dressed in a black beanie, a black puffy jacket, black pants, and black shoes.  His hands were in his jacket pockets as he spoke to the group.  Defendant was wearing a white shirt, sunglasses, and a black Pittsburgh Pirates hat with a gold "P" on it, which was commonly worn by members of a Sureño gang called Poor Side Watsonville.

Julian and defendant stopped near the basketball court.  Defendant stood behind Julian, giving the impression that he "could jump in" if there was a fight.  Julian asked the group, " 'Are you guys homies?' "  Jesus responded, " 'No, we don't bang.' "  Julian asked, " 'Are you sure you ain't homies?' "  Jesus responded, " 'Yeah, man, we don't bang.' "  Julian and defendant then turned and walked away in the direction from which they had come, going behind some of the apartments.

---

[2] As several of the people involved in the incident share last names, we will use first names for clarity.

Angel, Sonny, Jesus, Rene, and Marshall remained outside on the basketball court following the encounter with defendant and Julian. They talked about going inside, in case Julian and defendant returned. They began gathering their belongings, but they were still outside about 15 minutes later, when Rene saw defendant reflected in a nearby window in between some of the complex's apartment buildings. It appeared that defendant was "watching for something" or watching the group. Jesus also noticed defendant was walking behind some of the apartment buildings and looking in the direction of the basketball court.

About 30 seconds later, Julian approached the group again, walking fast. When Julian reached the basketball court, he pulled his hands out of his pockets, saying, " 'Where the fuck you from, then?' " or " 'Are you sure you guys don't bang?' " Julian pointed a gun towards the group. Sonny, Rene, Jesse, and Mitchell ran away. After hearing gunshots, Sonny went back and saw Angel laying down. He saw holes in Angel's shirt and blood coming out of his mouth. He yelled for someone to call an ambulance. Upon hearing Sonny yell, Rene and Jesse also returned to the court. Police and paramedics arrived, but they were unable to resuscitate Angel.

### B.    *Other Witnesses*

Janet Doten, a resident of the Apple Hill complex, saw two men walking back and forth near her apartment for about 15 minutes on the afternoon of March 21, 2009. She heard gunshots and then saw the two men run by again.

Miguel J. was visiting his girlfriend at the Apple Hill complex on the afternoon of March 21, 2009. He saw two men walk by, twice. He heard gunshots, then saw the two men together again a few seconds later. He told police that the two men had been "pacing back and forth" for about five minutes before the shots were fired. Miguel's girlfriend also saw the two men running together after the gunshots.

### C.    *The Prior Shooting*

Julian's brother, Michael Escobar, was shot in the leg the night before Angel was shot, at a location about two miles away from the Apple Hill complex. Michael was a member of the East Las Casitas subset of the Norteño gang, which is from Salinas and is also called the Salas Casitas subset. Michael had been shot by a member of the Varrio Green Valley subset of the Norteño gang after he was in a fight with a leader of Varrio Green Valley. After the shooting, Michael was taken to Stanford University Medical Center, where he underwent surgery to remove a bullet from his leg.

In January of 2010 (about nine months after the two shootings), Julian's wife, Monique Escobar, called 911, stating that she had information on the shooting at the basketball court. In an interview with the police, she described how she and Julian had been at Stanford University Medical Center the day after Michael was shot. Julian had left the hospital for several hours. When Julian returned to the hospital, defendant was with him. Julian had new shoes on, and he had changed from jeans into shorts.

Monique also described how defendant had been with Julian or on the phone with him when they initially learned that Michael had been shot. She overheard Julian saying that "they were from Green Valley." The day after Angel's shooting, Monique overheard Julian on the phone saying, "I took care of it."[3]

### D.    *Gang Evidence*

In 1997 and 2004, defendant had admitted that he was a Norteño gang member; he specifically claimed he belonged to the East Las Casitas subset. When defendant was arrested in 2010, however, he claimed he was a "Northern dropout." Julian admitted being an active Norteño gang member at the time of his arrest in 2010.

---

[3] At trial, Monique claimed that she had been angry with Julian and that she "made up" the story she told to the police.

Expert testimony on gangs was presented through Watsonville Police Detective Morgan Chappell and Salinas Police Officer Robert Zuniga. Although the rules of the Norteño gangs bar "red-on-red violence," such violence nevertheless occurs. After an East Las Casitas gang member is shot by a member of the Varrio Green Valley subset, the East Las Casitas subset would feel disrespected. A member of East Las Casitas might retaliate by coming to Watsonville—Varrio Green Valley's turf—and committing a violent crime there. The victim of the crime would not necessarily be a member of Varrio Green Valley and would not need to have any gang ties. Commission of the violent crime would give the East Las Casitas subset respect.

Gang members sometimes attempt to look like members of rival gangs, in order to throw the police off. A Pittsburgh Pirates hat was found at defendant's residence, and a bag full of blue and black clothing was found at Julian's residence.

### E. Charges, Verdicts, Pleas, and Sentencing

A second amended information charged defendant with the murder of Angel Escobedo (§ 187, subd. (a); count 1), four counts of attempted willful, deliberate, and premeditated murder of Sonny Escobedo, Jesus Nieto, Rene Lara, and Marshall Hernandez (§§ 664, 187, subd. (a); counts 2-5), and participation in a criminal street gang (§ 186.22, subd. (a); count 6). The second amended information alleged, as to counts 1 through 5, that the offenses were committed for the benefit of a criminal street gang and a principal used and personally and intentionally discharged a firearm that caused great bodily injury or death (§§ 186.22, subd. (b)(5), 12022.53, subds. (b)-(d), (e)(1)).

Defendant and Julian were tried together with separate juries. Defendant's jury found him guilty of murder (count 1) but found the criminal street gang enhancement not true and the firearm enhancements not applicable. Defendant's jury found him not guilty of participation in a criminal street gang (count 6). His jury could not reach a verdict as to the attempted murders (counts 2 through 5). Defendant subsequently pleaded guilty to

5

three of the four attempted murders (counts 2 through 4); the fourth attempted murder charge (count 5) was dismissed.

At the sentencing hearing, the trial court imposed an aggregate term of 26 years eight months to life, comprised of the seven-year midterm for count 2, a consecutive term of two years four months for count 3, a consecutive term of two years four months for count 4, and a consecutive term of 15 years to life for count 1.

## III.  DISCUSSION

Defendant contends there is insufficient evidence to support his conviction of second degree murder.  Specifically, defendant contends his conviction cannot be upheld on an aiding and abetting theory because there is (1) no evidence that he knew Julian intended to commit a crime or that Julian was armed and (2) no evidence that his "mere presence at the scene of the shooting" assisted or encouraged Julian to carry out the shooting.  Defendant also contends there is insufficient evidence to support his conviction on the basis of an uncharged conspiracy, arguing that "there is no evidence of an agreement" between himself and Julian.

### A.  *Legal Principles*

Under section 31, "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed."

" 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citations.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 (*Campbell*).)

"[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission.  [Citations.]

6

However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*Campbell, supra,* 25 Cal.App.4th at p. 409.)

In reviewing a claim of insufficiency of the evidence on appeal, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) "An appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.)

**B.     Arguments Below**

During argument to the jury, the prosecutor argued that the jury could infer defendant and Julian had an agreement prior to the shooting, based on their presence together at the Apple Hill complex and their actions in walking back and forth together. The prosecutor argued that defendant and Julian had been "doing reconnaissance" when they first approached the victims. With respect to the shooting, the prosecutor argued that defendant's role was to be "a deliberate distraction" or that he was "looking around for witnesses" to ensure that he and Julian would "get[] away with it." The prosecutor argued that defendant and Julian had gone to the hospital after the shooting in order to "set[] up an alibi."

The defense at trial was based on identity. Thus, defendant did not make any specific arguments regarding the aiding and abetting or uncharged conspiracy theories.

**C.     Analysis**

There was substantial evidence to support the jury's findings that defendant had knowledge of Julian's unlawful purpose, that he intended to facilitate or encourage Julian's commission of the murder, and that he acted or advised Julian in a manner that

7

aided, promoted, encouraged or instigated the commission of the murder. (See *Campbell, supra,* 25 Cal.App.4th at p. 409.)

Defendant was either a member or dropout of the East Las Casitas subset of the Norteño gang; Julian and Michael were both members of that gang. Defendant accompanied Julian to the Apple Hill complex, located in Varrio Green Valley's turf, the day after Michael was shot by a member of Varrio Green Valley. Expert testimony established that the shooting of an East Las Casitas gang member by a member of Varrio Green Valley would lead to a violent retaliatory act by a member of East Las Casitas, and that the retaliation could be carried out towards a non-gang member. Based on the expert testimony, defendant's present or past gang affiliation, and defendant's act of accompanying Julian to the Apple Hill complex, it was a reasonable inference that defendant knew Julian intended to commit a retaliatory violent act—i.e., that defendant had knowledge of Julian's unlawful purpose. (See *Campbell, supra,* 25 Cal.App.4th at p. 409.)

Defendant approached the victims along with Julian, in an aggressive manner, and he stood by Julian in a manner indicating he "could jump in" if there was a fight, while Julian asked the victims about their gang affiliation. Defendant also was wearing a baseball cap that was associated with a rival gang. Expert testimony established that gang members will sometimes wear such clothing in order to prevent them from being identified and caught by the police. Based on this evidence, the jury could reasonably infer that defendant intended to facilitate or encourage Julian's commission of a violent, retaliatory act. (See *Campbell, supra,* 25 Cal.App.4th at p. 409.)

Defendant then remained with Julian, walking back and forth in the apartment complex, until Julian went back to the basketball court and committed the shooting. The jury could reasonably infer that during the time they were walking together, defendant and Julian came to an agreement about the shooting or discussed the details of how they would commit the shooting—in other words, that defendant advised Julian in a manner

8

that aided, promoted, encouraged or instigated the commission of the murder. (See *Campbell, supra,* 25 Cal.App.4th at p. 409.)

The jury could also find that by remaining nearby, within eyesight of the basketball courts, defendant was acting as a lookout, and that he thereby aided, promoted, encouraged or instigated the commission of the murder. (See *People v. Silva* (1956) 143 Cal.App.2d 162, 169 (*Silva*) ["It has been consistently held that one who was present for the purpose of diverting suspicion, or to serve as a lookout, or to give warning of approach of anyone seeking to interfere . . . is a principal in the crime committed."].) There is no evidence that defendant was surprised by Julian's conduct or that he attempted to stop Julian from committing the murder. (See *Campbell, supra,* 25 Cal.App.4th at p. 409.)

Finally, defendant ran away with Julian and accompanied him to the hospital, helping Julian to get away from the scene and create an alibi. (See *Silva, supra,* 143 Cal.App.2d at p. 169 [one who enables the direct perpetrator "to make a successful 'getaway' " is an aider and abettor].) Defendant's companionship with Julian after the shooting confirms he intended to aid and abet Julian in the murder. (See *In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)

On this record, the jury could find that defendant was not merely present at the scene of a crime but rather that defendant " '(i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime.' [Citations.]" (*Campbell, supra,* 25 Cal.App.4th at p. 409.) Substantial evidence thus supported the jury's finding that defendant was liable for the murder based on an aiding and abetting theory.[4]

---

[4] We need not determine whether the jury also could have convicted defendant of the murder based on an uncharged conspiracy theory.

## IV. DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MIHARA, J.

_____

GROVER, J.